[Cite as *State v. Tatum*, 2014-Ohio-386.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 99818

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## DARRIN TATUM

DEFENDANT-APPELLANT

## JUDGMENT:
REVERSED AND REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-564471

**BEFORE:** Boyle, A.J., E.A. Gallagher, J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** February 6, 2014

**ATTORNEY FOR APPELLANT**

Russell S. Bensing
1350 Standard Building
1370 Ontario Street
Cleveland, Ohio   44113

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:   Kerry A. Sowul
Assistant County Prosecutor
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, A.J.:

**{¶1}** Defendant-appellant, Darrin Tatum, appeals his convictions for aggravated robbery and kidnapping. He raises one assignment of error for our review:

> The trial court erred in limiting the closing argument of defense counsel, in violation of defendant's 6th Amendment right to the effective assistance of counsel.

**{¶2}** Finding merit to his argument, we reverse and remand.

<u>Procedural History and Factual Background</u>

**{¶3}** Tatum was indicted in July 2012 on two counts: kidnapping in violation of R.C. 2905.01(A)(2), and aggravated robbery in violation of R.C. 2911.01(A)(1). Both counts carried one- and three-year firearm specifications. Tatum pleaded not guilty to the charges, and the case proceeded to a jury trial. The following facts were presented at trial.

**{¶4}** The victim testified that on June 11, 2012, he left work around 4:00 or 5:00 p.m. He hit some golf balls after work. Around 7:30 or 8:00 p.m., he called his drug dealer, who he knew by the nickname "Jabs," to purchase marijuana. He told his drug dealer that he was driving on Invermere Street, near East 190th Street. The victim's drug dealer told him to pull off on the side of the road and the drug dealer would meet him there. The victim turned from Invermere Street onto East 188th Street. He turned his car around and parked on East 188th Street to wait for his drug dealer.

**{¶5}** While the victim was waiting, three young males walked out of a yellow house across the street from where he was parked, walked past his car at first, and then turned around, walked up to his driver's-side window, and started talking to him. The victim testified that only one of three males, who he later identified to be Tatum, spoke to him; the other two stood off to the side.

**{¶6}** The victim said that Tatum asked him, "What are you doing?" The victim told Tatum that he was waiting for a friend. Tatum then demanded that the victim give him money that the victim had in his cup holder. The victim said that he had about $115 or $120 in his cup holder. The victim refused. At that point, Tatum lifted up his shirt and showed the victim that he had a black gun in his waistband. The victim gave Tatum his money. Tatum then demanded that the victim give him his cell phone. The victim said no, and Tatum "pulled out the gun." The victim asked Tatum, "you're going to shoot me over an iPhone?" Tatum replied, "it is what it is," reached inside the victim's window, and took the victim's cell phone.

**{¶7}** The victim testified that after Tatum took his cell phone, all three males ran away. The victim followed them in his car. The victim soon saw a police car and flagged it down. He told the officers what had just happened, that he was "robbed at gunpoint." The victim told the officers which way the males ran after they robbed him. The victim also showed police the yellow house that the males came out of before they robbed him.

**{¶8}** The victim stated that he did not initially tell police why he was parked on East 188th Street. He testified that he was "scared to tell them [he] was up there to buy weed" because "it's illegal." The victim testified that Tatum was not his drug dealer. The victim also testified that his drug dealer never showed up that day.

**{¶9}** Detectives Gerald Sowul and John Kraynick met with the victim at his parents' home. They asked him what happened. The victim told them how the three males robbed him at gunpoint, again leaving out the part about why he was sitting in his car on East 188th Street. When asked why he did not tell police that he was waiting for his drug dealer, the victim stated that it was because his parents were there when the detectives were questioning him, plus he did not want to tell the detectives that he was doing something illegal. The detectives showed the victim a photo array. The victim chose Tatum out of a photo array on June 20, 2012.

**{¶10}** Later, police asked the victim to come to the police station. Police had obtained the victim's cell phone records to find out if someone had used his cell phone after it was stolen. Police saw that immediately before the alleged robbery took place, the victim had been calling a known drug dealer in the area where the victim was robbed. The officers asked the victim to tell the truth as to why he was parked on East 188th Street. At that point, the victim told police that he was there to buy marijuana. The officers showed the victim another photo array that included a different photo of Tatum, as well as five different males from the first photo array. The victim chose Tatum again from the second photo array on July 11, 2012.

**{¶11}** The jury found Tatum guilty of both kidnapping and aggravated robbery, as well as the one- and three-year firearm specifications. The trial court merged the firearm specifications and the kidnapping and aggravated robbery charges. The state elected to proceed on the aggravated robbery count. The trial court sentenced Tatum to three years in prison for aggravated robbery and three years for the firearm specifications, to be served consecutive to one another, for an aggregate sentence of six years in prison. It is from this judgment that Tatum appeals.

### Restrictions on Defendant's Closing Argument

**{¶12}** In his sole assignment of error, Tatum argues that the trial court violated his Sixth Amendment right to counsel by precluding his defense counsel from arguing his theory of defense during closing argument, namely, that a robbery never took place.

**{¶13}** "The assessment of whether the permissible bounds of closing argument have been exceeded is, in the first instance, a discretionary function to be performed by the trial court. Such determination will not be reversed on appeal absent an abuse of discretion." *Pang v. Minch*, 53 Ohio St.3d 186, 559 N.E.2d 1313, paragraph three of the syllabus. The phrase "abuse of discretion" has been described as a ruling that lacks a "sound reasoning process." *State v. Ceron*, 8th Dist. Cuyahoga No. 99388, 2013-Ohio-5231, ¶ 66, quoting *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528.

**{¶14}** The Sixth Amendment provides in pertinent part that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to have the assistance of counsel for

his defense." It is well established that this right encompasses the "right to make a closing summation to the jury, no matter how strong the case for the prosecution may appear to the presiding judge." *Herring v. New York*, 422 U.S. 853, 858, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975) (finding a New York law unconstitutional when it permitted a trial judge, in a nonjury criminal trial, the power to deny counsel any opportunity to make a closing argument).

{¶15} In *Herring*, the United States Supreme Court explained:

> It can hardly be questioned that closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. For it is only after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole. Only then can they argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions. And for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt.

*Id*. at 862.

{¶16} Both prosecutors and defense attorneys, however, are given wide latitude during closing arguments to address what the evidence has shown and what reasonable inferences may be drawn from that evidence. *State v. Black*, 181 Ohio App.3d 821, 2009-Ohio-1629, 911 N.E.2d 309, ¶ 33 (2d Dist.), citing *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990). A trial court, however, may limit arguments that are unduly time consuming, "stray unduly from the mark, or otherwise impede the fair and orderly conduct," denying an accused the right to make final arguments on his theory of the defense denies him the right to assistance of counsel. *Herring* at 862, 865.

**{¶17}** In *State v. Powell*, 177 Ohio App.3d 825, 2008-Ohio-4171, 896 N.E.2d 212, ¶ 45 (4th Dist.), the court explained that during closing argument:

> Trial counsel may advocate and persuade to the limit of his or her ability and enthusiasm but cannot misrepresent evidence or go beyond the limits set by the trial court. As such, counsel may freely discuss the facts, arraign the conduct of parties, impugn, excuse, justify, or condemn motives according to the evidence, and attack the credibility of witnesses when the record supports the same. The court should not be severe in arresting argument on the ground that the argument or inference is illogical.

(Citations omitted.)

### Analysis

**{¶18}** In this case, Tatum argues that the trial court improperly limited his closing argument in violation of his Sixth Amendment rights because his defense counsel did not misrepresent facts that were not in evidence, but rather, simply argued what the jury could infer from facts that were in evidence. Essentially, Tatum maintains that the trial court prevented him from arguing *his theory* of the case — that is, that a robbery never took place.

**{¶19}** During Tatum's cross-examination of the victim, defense counsel asked if it was true that Tatum approached the victim while he was sitting in his car. The victim agreed that was true. The following exchange then took place between Tatum's defense counsel and the victim:

> [Defense counsel]: Didn't my client offer to get you what you were looking for?
>
> [The victim]: I don't recall that happening necessarily.

[Defense counsel]: You don't recall that happening necessarily? Didn't he say, what are you looking for?

[The victim]: He might have said, what are you looking for, yes.

[Defense counsel]: Okay. And he said, I can get you what you're looking for. How much you got?

[The victim]: Yes, he might have said that, yes.

[Defense counsel]: And so he offered to get you what you were looking for. Isn't that true?

[The victim]: Yes.

[Defense counsel]: So he offered to get you what you were looking for. Remember, you're under oath here.

[The victim]: Yes.

[Defense counsel]: All right. Isn't it further true that he then walked away from your car back to the yellow house that's been shown to you in those exhibits up there?

[The victim]: I don't recall that, no.

[Defense counsel]: You don't recall that?

[The victim]: No, not — him leaving the car to go to the house, then coming back to my car?

[Defense counsel]: Yeah.

[The victim]: No.

[Defense counsel]: With something you were looking for.

[The victim]: No.

[Defense counsel]: But it wasn't what you were looking for, was it?

| [The victim]: | I don't recall him showing me anything, other than the gun. |
|---|---|
| [Defense counsel]: | All right. So more coming out today that's not in your statements, right? He offered to get you what you were looking for. He knew you were there to buy drugs. He offered to get you drugs. You didn't like what he got you. He took your money, duped you, and you got pissed off. You saw the cops and you made a report. Isn't that the truth? |
| [The victim]: | No. |
| [Defense counsel]: No? | |
| [The victim]: | No. |

{¶20} During Tatum's closing argument, his defense counsel argued:

Look what's reasonable here. Upon cross-examination, I started asking him, isn't it true that my client asked you what you were looking for, what you needed? Yeah, yeah, that might have happened. What are you looking for? What do you need? I can get it for you. Yeah, that might have happened. He was so close, to opening up about the rest of the story —

{¶21} The state objected at that point, and the trial court sustained the objection.

{¶22} Defense counsel continued: "I would submit to you, ladies and gentlemen, my client had an interaction with [the victim]. [The victim's] dealer didn't show up. My client happened to be there, offered to get him what he was looking for."

{¶23} The state objected a second time, and the trial court sustained the objection.

{¶24} Defense counsel argued:

Ladies and gentlemen, you're going to be the jurors, the judges of the credibility of the witnesses, that came in here to testify. I would submit to

you that what happened, is [the victim] was sitting in his car, after his involvement with my client, figured out he got some bogus weed —

{¶25} The state objected again, and the trial court sustained the objection.

{¶26} Upon review, we must determine if defense counsel's argument — that no robbery occurred and that what did occur was a "drug deal gone bad" — was a reasonable inference to make based upon the evidence presented at trial. If so, then the trial court abused its discretion when it sustained the state's objection and prevented defense counsel from arguing Tatum's theory of defense.

{¶27} On direct examination, the victim testified that Tatum walked up to him, asked him what he was doing there, and then took his money and his cell phone, in that order. On cross-examination, and through the police officer's testimony, we learned that the victim told police in a written statement that Tatum walked up to him, asked him what he was doing, and took his cell phone first and then his money. Either way, according to what the victim testified to on direct examination and what he told police, Tatum walked up to him, asked him what he was doing, and then robbed him.

{¶28} During cross-examination, however, the victim admitted that several other things "might have happened" or did actually happen. The victim admitted that Tatum might have said, "what are you looking for?" The victim also admitted that Tatum might have said, "I can get you what you're looking for. How much you got?" And the victim further admitted that Tatum did in fact offer to get him "what [he] was looking for."

{¶29} Although the victim later denied that Tatum went back to the yellow house, returned to the victim's car, and denied that Tatum actually got him what he was "looking

for," defense counsel's argument — that the jury could infer that more may have happened between the victim and Tatum — was a reasonable inference. Indeed, it was reasonable to infer that the victim may have purchased marijuana from Tatum. The victim testified that his drug dealer never showed up. Further, the victim's admissions on cross-examination were in direct contrast to what the victim testified to on direct examination, i.e., that Tatum walked up to him, asked him what he was doing there, and then told him to give him his money and his cell phone. Tatum's defense counsel was not misrepresenting the evidence; he was merely arguing to the jury what it could infer from the evidence.

{¶30} Thus, we find that the trial court abused its discretion when it prevented Tatum's defense counsel from properly arguing his theory of the case — that a robbery never happened.

### Harmless Error Analysis

{¶31} We must still determine if the trial court's infringement on Tatum's Sixth Amendment right to counsel was harmless error. Whether we apply the constitutional harmless error standard that Tatum proposes or the harmless error standard under Crim.R. 52(A), we conclude that the trial court's error was not harmless error.

{¶32} By sustaining the state's objection during Tatum's closing argument, the trial court prevented the jury from considering Tatum's defense — that a robbery never occurred. The trial court had instructed the jury that it was permitted to make reasonable inferences based on the evidence presented at trial. But here, the jury was prohibited

from inferring from the victim's testimony that because the victim left out X, he may have also left out Y. In other words, the jury was prevented from inferring that because the victim left out the fact that Tatum said more to him than what the victim originally testified to on direct or told police in his statement, that the victim may have also left out the fact that Tatum did in fact get the victim what he wanted, marijuana, and that the victim did not like the product, so he sought out the police and told them that Tatum robbed him.

{¶33} Further, this was a case of "he said/he said." The jury had to decide if it believed the victim or Tatum, through Tatum's theory of defense since Tatum did not testify. Had Tatum's defense counsel been able to argue his theory of defense to the jury — based on the fact that the victim admitted several things on cross-examination that he left out of his direct examination — the jury may have found that the victim was lying about the robbery. Therefore, we find that the trial court's decision to limit Tatum's closing argument affected the jury's determination on the key issue of credibility. Stated another way, we cannot say that the trial court's restriction on Tatum's closing argument did not affect the jury's determination.

{¶34} Tatum's sole assignment of error is sustained.

{¶35} Judgment reversed. Tatum's convictions are vacated. This case is remanded to the lower court for further proceedings consistent with this decision.

It is ordered that appellant recover of appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, ADMINISTRATIVE JUDGE

EILEEN A. GALLAGHER, J., and
PATRICIA ANN BLACKMON, J., CONCUR